**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HELEN BLAND | :: | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 06-226-GMS-MPT |
| | : | |
| MICHAEL J ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

**<u>REPORT AND RECOMMENDATION</u>**

**Introduction**

Plaintiff Helen Bland ("plaintiff") filed this action against defendant Michael J.

Astrue,[1] Commissioner of Social Security ("defendant"), on April 6, 2006.  Plaintiff seeks

judicial review, pursuant to 42 U.S.C. § 405(g), of a decision by defendant denying

plaintiff's claim for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under the Social Security Act ("SSA").  Currently before the court are the

parties' cross motions for summary judgment.  For the reasons stated below, the court

recommends that plaintiff's motion for summary judgment be denied, and that

defendant's cross-motion for summary judgment be granted.

**Procedural Background**

On January 28, 2004, plaintiff filed applications for DIB and SSI.  The initial claim

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, after this proceeding was initially filed.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), Michael J. Astrue replaced the previous Commissioner, Jo Anne B. Barnhart, as the defendant in this case.

and a motion for reconsideration were denied by the Commissioner.  Plaintiff then

requested a hearing before an administrative law judge ("ALJ").  A hearing before an

ALJ was held on June 23, 2005 and, on September 16, 2005, the ALJ denied plaintiff's

claims.  Subsequently, plaintiff filed an appeal with the Appeals Council and on

November 4, 2005, the Appeals Council declined to grant plaintiff's request for review.

On April 6, 2006, plaintiff filed for summary judgment in the District Court of Delaware.

**Findings of the ALJ**

On September 16, 2005, the ALJ found the following:

1. The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(i) of the SSA through December 31, 2008.
2. The claimant has not engaged in substantial gainful activity since January 4, 2004 (20 CFR §§ 404.1520(b) and 416.920(b)).
3. The claimant has the following severe impairments: dizziness secondary to diabetes mellitus, degenerative disc disease of the lumbar spine, and a degenerative joint disease in the left knee (20 CFR §§ 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR §§ 404.1520(d) and 416.920(d)).
5. Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with the following additional limitations: low stress, the need to alternate positions between sitting and standing, and no temperature extremes or humidity.
6. The claimant is capable of performing past relevant work as a home health aide.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CRF § 404.1565).
7. The claimant has not been under a "disability," as defined in the SSA, from January 4, 2004 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

On October 4, 2005, the Appeals Council denied review of the ALJ's determinations, so

those findings became the final decision of the Commissioner.[2]

**Plaintiff's Written Submissions to SSA**

On January 2, 2004, plaintiff was admitted to the hospital for a syncopal episode, flu-like syndrome, and possible sinusitis.  The secondary admitting diagnose noted that plaintiff had type 2 diabetes, morbid obesity, coronary artery disease and chronic hypertension.  Plaintiff underwent a CT scan and electrocardiogram, both of which were negative.  Plaintiff was discharged with instructions to follow up with her primary care physician, Dr. Haldar.  In the discharge note, the attending physician stated that plaintiff's syncopal episode was secondary to marked bradycardia and a pacemaker may be needed if she continued to experience symptoms of bradycardia.

On January 26, 2004, plaintiff submitted an application for DIB claiming that her disabling condition had prevented her from working since January 2, 2004.  On March 10, 2005, plaintiff claimed, in a social security update form, that she experienced occasional headaches, back pain, radial leg pain, and dizziness.  In addition, plaintiff stated that she was depressed, anxious, and irritable.  However, on that form, plaintiff checked the box that indicated that she had no limitations regarding work activities at home or on the job.  Plaintiff did note that she did not read as frequently as she had before the alleged problems began.

On February 15, 2004, plaintiff was readmitted to the hospital for a syncope episode which lasted thirty to sixty seconds.  The discharge summary dated March 14, 2004, provided that she could return to work as recommended by Dr. Haldar.  Plaintiff

---

[2]All facts and medical information referenced herein are found at D.I. 16, 18, and 21.

was advised to wear thigh-high support stockings daily after she got out of bed to prevent further episodes of lightheadedness and syncope.

On February 21, 2004, plaintiff stated in a daily activities questionnaire, filled out for the SSA, that she was able to get up, shower, make breakfast, take medications, go visit her sister, cook, clean, read, and watch tv.  Plaintiff claimed that she was less active and stayed home more often because she often felt light headed or dizzy.  She denied needing help with cooking, cleaning, or doing other household chores because if she felt dizzy then she would sit down.  Plaintiff admitted that she either walked or drove to the grocery store.  Plaintiff argued that if she became dizzy at work it would be dangerous because she works with mentally handicapped individuals.

In a recommendation, dated February 25, 2004, her HIV physician noted that plaintiff could continue working as long as she was not standing for 8 hours or longer. However, that doctor emphasized because her cardiac status was outside his area of expertise, her primary physician should be contacted regarding plaintiff's ability to work.

In March 2004, plaintiff had a pacemaker installed.  Thereafter, as a result of referrals by Dr. Haldar, her syncopal episodes were primarily treated by Dr. Kottiech, a cardiologist, and Dr. Ionita, a neurologist.

On May 7, 2004, plaintiff was referred to Dr. Jona Gorra by Delaware Disability Determination Services because of a low heart rate.  Dr. Gorra noted that plaintiff had recurrent syncopal episodes since the pacemaker implantation, but that her overall dizziness had decreased and she relieved the dizziness by sitting down.  Upon physical examination, Dr. Gorra found no range of motion limitations to her arms, legs, or back, but noted some difficulty squatting due to back pain.

4

In May 2004, plaintiff informed Dr. Kottiech that her dizziness had subsided and that she only experienced minimal dizziness since the pacemaker installation.  A Tilt Table test was normal and Dr. Kottiech recorded plaintiff's condition as improved.  She was prescribed a beta-blocker and ProAmatine, medications which increase blood pressure and heart rate.

On July 16, 2004, during an office visit, Dr. Kottiech noted that plaintiff complained of increased dizziness, syncope, and near syncope.  A second Tilt Table test was performed which produced normal results.  On April 26, 2005, plaintiff saw Dr. Kottiech and reported that she was doing better.

On June 5, 2004, plaintiff underwent a Residual Functional Capacity ("RFC") assessment by John Kramer, M.D., a state agency physician.  Dr. Kramer determined that plaintiff could stand and/or walk and/or sit for a total of six hours in an eight-hour workday; was able to lift twenty pounds occasionally and ten pounds frequently; and, had unlimited push and pull weight restrictions.  Dr. Kramer opined that plaintiff could perform a range of light duty work.

On June 23, 2004, plaintiff claimed, in a disability appeal report, that she could no longer drive, was still passing out, and needed facet nerve injections in her lower back to alleviate pain.  She denied, however, that her illnesses, injuries, or condition affected her ability to care for her own personal needs as long as she could sit.  In addition, she was afraid of being alone for fear of passing out at any time.

On July 21, 2004, plaintiff went to the Beebe Medical Center Emergency Room due to an eye injury.  She related that she had passed out while getting into a car and hit her head.  She also reported that she had syncope episodes about two to three

times a week and that they were occurring with more regularity since the pacemaker implantation.  The E.R. record noted that plaintiff arrived unaccompanied and drove herself home.

On July 27, 2004, Dr. Olewiler, an infectious disease doctor, examined plaintiff and noted that she looked "entirely well."  In addition, he did not return plaintiff to any HIV medicines.  His report for that office visit contained no reference to plaintiff's presyncope problems.

On August 27, 2004, plaintiff submitted a Social Security Update form in which she complained of headaches and lower back pain which radiated into her right leg.  She also reported that she often experienced extreme dizziness, which required her to lay or sit down to avoid fainting.  Plaintiff felt that she was depressed and irritable because she did not understand what was happening to her.  As a result of her health problems, she claimed that her social events were curtailed.

On September 15, 2004, plaintiff was seen by Dr. Ionita.  Plaintiff related that she knew when she was having a syncopal episode, which she controlled by sitting.  Plaintiff acknowledged that the episodes subsided within five minutes after she sat.  She also admitted that she had not fainted for months.  Dr. Ionita diagnosed her dizziness as orthostasis and autonomic dysfunction, probably secondary to diabetes.

On September 27, 2004, plaintiff underwent a second RFC assessment, which was performed by Michael Borek, D.O., a state agency physician.  Dr. Borek agreed with the first RFC.  He also concluded that plaintiff was exaggerating her condition.

On October 12, 2004, plaintiff informed Dr. Ionita that her dizziness and associated symptoms occurred mostly while standing and occasionally while sitting.  On

6

physical examination, she exhibited normal strength and a normal gait.  No neurological deficits were noted.  Dr. Ionita recommended that plaintiff be examined at a university center.

Attending to a Disability Report Appeal application dated November 11, 2004, plaintiff claimed that severe headaches had accompanied the dizziness since September 2004.  She further represented that she had been restricted from driving since September 2004.  She also noted sustaining an eye injury in July 2004 due to syncope.

In a letter dated November 23, 2004, Dr. Ionita reported that plaintiff could no longer safely operate a motor vehicle due to dizziness and syncopal episodes.  She recommended that plaintiff use public transportation.  By March 23, 2005, Drs. Ionita and Kottiech determined that her symptoms had improved and lifted the driving restriction.

On January 11, 2005, plaintiff submitted a Social Security Update form in which she reported experiencing occasional headaches, back aches, pain through her leg, and dizziness.  The only limitation that she noted was suspension of her driver's license.  She complained of feeling stressed because she could not pay her bills.

On January 24, 2005, Dr. Ionita recorded that the physicians at the University of Maryland agreed with her diagnosis of autonomic dysfunction.  Plaintiff reported a dizzy spell on Christmas Day as the last and most recent episode.  Dr. Ionita advised that plaintiff could resume driving if she did not pass out for at least three months.

A discharge summary dated February 10, 2005 from the Medical Center advised that plaintiff should avoid heavy lifting, extreme temperatures, driving, and overwork.  In

7

addition, she was instructed to gradually increase activity as tolerated.

On February 23, 2005, Dr. Ionita noted that plaintiff wanted her driving privileges back.  The report noted that if plaintiff's tests were normal and she does not pass out for the next three months than she can get her driving privileges reinstated.

On March, 23, 2005, plaintiff reported to Dr. Ionita that she had not lost consciousness since Christmas and that her overall dizziness had improved.  The headaches were controlled with Tomax.  At that time, Dr. Ionita agreed to reinstate her driving privileges.

In an office visit with Dr. Ionita on April 26, 2005, plaintiff denied any further episodes of syncope.  A follow up appointment was recommended by Dr. Ionita and plaintiff was prescribed Coumadin for six months.

**Plaintiff's Depression**

Plaintiff complained of depression, stress, crying spells, disturbed sleep, deceased energy, and dizziness to Dr. Ahmed, a psychiatrist, on December 3, 2004.  At that time, plaintiff was diagnosed with dysphoria and her Zoloft dosage was increased to 100 mg daily.  On December 21, 2004, plaintiff reported improvement in her mood since the Zoloft has been increased.

During an office visit with Dr. Ahmed in February 2005, plaintiff stated that her depression was under control.  She further related that the side effects from the Zoloft were eliminated since taking the medication in the evening.  Dr. Ahmed found that plaintiff's condition was stable, with no suicidal thoughts.  Because her depression remained under control, on May 16, 2005, Dr. Ahmed extended plaintiff's follow up visits to two to three months.

8

In November 2004, the attending physician at Milton Health Center noted sad affect and diagnosed depression.  Earlier, in September 2004, plaintiff reported symptoms of depression to Dr. Ionita.  Neither Dr. Ionita nor the attending physician at Milton Health Center referred plaintiff to a mental health professional.

During three separate visits to Delaware Cardiovascular Associates between August 30, 2004 and February 2, 2006, plaintiff denied any depression, anxiety, or alcohol abuse.

**Treatment for Plaintiff's Back and Knee Pain**:

Plaintiff was treated by Dr. Somori, a pain specialist, at Coastal Pain Care Center on December 11, 2003 for a sharp pain in her lower back, which radiated into her leg. Plaintiff was diagnosed with chronic low back pain, rule out bilateral lumbar facet syndrome at L4-5, L5-S1, and morbid obesity, status post-gastric bypass surgery.  At this time, she was advised to restart the Curves exercise program.

From January 2004 to February 2005, plaintiff returned to the Coastal Pain Care Center approximately every month due to complaints of lower back pain with radicular leg pain.  A CT scan of the lumber spine demonstrated additional degenerative changes in the facet joints at L5-S1 since a MRI taken on July 1, 2003.  Dr. Somori did not impose any restrictions on plaintiff's physical activities.

In May 2005, plaintiff complained to Dr. Somori about back pain which she related to increased activity in preparation for her wedding.  Dr. Somori only recommended that plaintiff continue with her current medication.

During office visits to Dr. Somori between December 2003 to February 2005, plaintiff complained of lower back pain with a pain score ranging from five to nine on a

scale of ten, for which she received multiple lumbar facet injections that generally provided her limited relief.

On May 25, 2005, x-rays of plaintiff's left knee disclosed that she had osteoarthritic changes and joint effusion.  In July 2005, she was scheduled for a left knee arthroscopy.[3]

**Facts Evinced at The Administrative Law Hearing**

**Plaintiff's Testimony**

At the administrative hearing on June 23, 2005, plaintiff testified that she was 5'6" and weighed 225 pounds.  She related that she had started working at the age of eight and continued to work until January 2004 when she stopped because of dizziness and syncope.  Plaintiff obtained a high school diploma and a certificate in phlebotomy. She claimed experiencing one dizziness episode per week, which was controlled by sitting.  Although she testified that she could control the syncope since she was aware of its onset, she also stated that those episodes were unpredictable and could take up to thirty minutes to subside.

Plaintiff also testified that her leg and back pain worsened since 2003.  Plaintiff stated that she received multiple epidermal injections and medications, but that neither were helpful in decreasing her pain.  She related that she takes Percocet for pain, Slekaxin for muscle spasms, and Vicodin for knee pain.  Plaintiff testified that she could stand for four or more hours at a time before her knee pain became severe.

Plaintiff further testified that dizziness primarily prevents her from working.  She

---

[3]Record does not indicate whether or not this procedure was performed.

stated that she would love to return to work.  In addition, plaintiff claimed that knee and back pain would prevent her from heavy lifting.

Plaintiff also reported that she was seeing a psychiatrist for depression, which she related was caused by bill collectors and her mounting debt since her unemployment.  Plaintiff maintained that she discontinued all hobbies and socializing with family and friends.  Plaintiff stated that she is depressed, cries a lot, and takes Zoloft for the depression.

Plaintiff testified that a blood clot occurred in her arm, which resolved in less than three weeks.  Because of that incident, she was prescribed the blood thinner, Coumadin.  Plaintiff further claimed that she avoid activities which could subject her to cuts or bruises because of uncontrolled bleeding, an alleged side effect of the Coumadin.

**Louise Henry's Testimony**

Louise Henry ("LH"), plaintiff's sister-in-law, testified that she has known plaintiff for thirty years.  She suggested that plaintiff stopped working because of her health.  In addition, LH noted that she visits plaintiff three or four times a week.  LH also confirmed plaintiff's complaints of dizziness, back, and knee problems.  LH specifically stated that plaintiff complained of dizziness six to seven times in the eighteen months.  LH, however, also advised that plaintiff does a variety of household activities without assistance.

**Kim Schanele's Testimony**

Kim Schanele ("Schanele"), a social worker from the Division of Public health,

testified on behalf of plaintiff at the ALJ hearing.  Schanele stated that she has observed no improvement in plaintiff's health in the last fourteen to fifteen months and that she visits plaintiff every couple weeks.  Schanele stressed that the biggest health problem facing plaintiff are the dizzy spells.  Despite her relative frequent contacts with plaintiff, Schanele never witnessed plaintiff having a dizziness spell.  Schanele is aware of plaintiff's back and knee problems, and the blood clot incident.  Schanele testified that plaintiff described herself as being depressed because she had no income. Schanele stated that if plaintiff was not disabled purportedly she would work.

**Vocational Expert's Testimony**

The vocational expert ("VE"), Mitchell Schmidt, testified as to plaintiff's ability to perform her previous job.  Based on plaintiff's description, the VE categorized plaintiff's former employment as medium duty, semi-skilled work.  The VE confirmed that plaintiff has some transferable skills with respect to communicating with special needs people and the elderly, and attending to such individuals.

The VE classified a home health aide position as light or sedentary work.  In addition, the VE reported that approximately 4,000 of those jobs exist in the State of Delaware.  Such employment, would allow plaintiff to sit or stand and is low in stress. The VE determined any hazards in that type of employment as minimal.  The only limitation that the VE found applied to plaintiff's ability to return to her former job was the operation of a motor vehicle in traffic because of the dizzy spells.  Ultimately, the VE concluded that a home health aide or companion would accommodate plaintiff's medical limitations and would allow her the flexibility to schedule doctor appointments.

**ALJ Decision**

The ALJ concluded that plaintiff's impairments of dizziness secondary to diabetes mellitus, degenerative disc disease of the lumbar spine, and degenerative joint disease of the left knee were severe, but did not to meet or equal any of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app.1.  In addition, the ALJ found that plaintiff's depression was not severe and it did not significantly affect her ability to work. The ALJ determined that plaintiff could perform low stress, light duty work which permitted her to alternate between sitting and standing and was performed in an environment free of temperature extremes or humidity.  Based on those work-related limitations and the VE's testimony, the ALJ held that plaintiff could return to her prior employment as a home health aide.

The ALJ concluded that plaintiff's medically determinable impairments could reasonably be expected to produce the her symptoms.  However, the ALJ stated that plaintiff's testimony concerning the intensity, duration, and limiting effects of her symptoms was not entirely credible.  Since the ALJ determined that plaintiff could return to her past work, she was not found disabled under the SSA.

**Jurisdiction**

A district court's jurisdiction to review an ALJ's decision regarding disability benefits is controlled by 42 U.S.C. § 405(g).  The statute provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain review of such decision by a civil action."[4]  The

---

[4] 42 U.S.C. § 405(g)(2002).

Commissioner's decision becomes final when the Appeals Counsel affirms an ALJ opinion, denies review of an ALJ decision, or when a claimant fails to pursue available administrative remedies.[5]  In the instant matter, the Commissioner's decision became final when the Appeals Counsel affirmed the ALJ's denial of benefits.  Thus, this court has jurisdiction to review the ALJ's decision.

**Standard of Review**

A district court's review of the Commissioner's decision is limited to whether that decision is supported by substantial evidence.[6]  If the decision is supported by substantial evidence, then the court is bound by the factual findings therein.[7]  Substantial evidence has been defined as less than a preponderance, but "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[8]

"The court[9] shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of

---

[5] *Aversa v. Secretary of Health & Human Services*, 672 F.Supp. 775, 777 (D.N.J. 1987); *see also* 20 C.F.R. § 404.905 (2002).

[6] *Jesurum v. Sec'y of the United States Department of Health & Human Servs.,* 48 F.3d 114, 117 (3d. Cir. 1995) (citing *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d. Cir. 1988)); *see also* 42 U.S.C. § 405(g).

[7] *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).

[8] *Ventura v. Shalala*, 55 F.3d 900, 901(3d Cir. 1995)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[9] "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the District Court of the United States for the District of Columbia [United States District Court for the District of Columbia]." 42 U.S.C. § 405(g).

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."[10]

"'Substantial evidence . . . must do more than create a suspicion of the existence of a fact to be established . . . it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'"[11]

"Overall this test is deferential, and we grant similar deference to agency inferences from facts if those inferences are supported by substantial evidence, even where this court acting de novo might have reached a different result."[12]  Furthermore, "the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding."[13]  Thus, "a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence."[14]  "Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion."[15]

This standard has also been embraced by the Supreme Court for determining

---

[10] 42 U.S.C. § 405(g); 5 U.S.C. § 706(E); *see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[11] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).
[12] *Monsour Med. Ctr.*, 806 F.2d at 1190.
[13] *Id.*
[14] *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000).
[15] *Id.*

the availability of summary judgment pursuant to Fed. R. Civ. Pro. 56.[16]  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[17]

 "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."[18]  There is a genuine issue of fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.*"[19]*  Additionally, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an [essential element] . . . on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of [that] . . . party's case necessarily renders all other facts immaterial."[20]

The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact.[21]  A moving party can meet its burden if the party shows the district court "that there is an absence of evidence to support the nonmoving

---

[16] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-251 (1986); *see also Williams v. Apfel*, 2000 U.S. Dist. LEXIS 4888 at *17 (D. Del. March 30, 2000), *vacated by, Williams v. Apfel*, 2001 U.S. Dist. LEXIS 9048 (D. Del. March 30, 2001).
[17] FED. R. CIV. P. 56(c).
[18] *Anderson,* 477 U.S. at 247-48.
[19] *Id.* at 248 (citations omitted).
[20] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).
[21] *Id.* at 323.

party's case."[22]  On the other hand, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"[23]

When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party drawing all reasonable inferences in that party's favor.[24]  The court should grant the motion "unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party."[25]  In deciding a motion the court should apply the evidentiary standard of the underlying cause of action.[26]

> In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed . . . mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.[27]

Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of mental disability, the Commissioner or the ALJ must consider the subjective complaints and "specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[28]  Despite the deference given to administrative decisions in disability benefit cases, "appellate courts retain a

---

[22] *Id.* at 325.

[23] *Id.* at 321 (citing *Catrett v. Johns-Manville Sales Corp.,* 756 F.2d 181, 184 (1985)).

[24] *Anderson, 477 U.S.* at 255.

[25] *Id.* at 251.

[26] *Id.* at 251-52.

[27] *Id.* at 251.

[28] *Matullo v. Bowen*, 926 F.2d 240, 245 (3d. Cir. 1990); *see also Smith v. Califano,* 637 F.2d 968, 970 (3d. Cir. 1981).

responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence."[29]

**Discussion**

### Disability Determination Process

Title II of the SSA, 42 U.S.C. § 423 (a) (1) (D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[30]   A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[31]

In *Plummer v. Apfel*, the Third Circuit outlined the appropriate test for determining whether a disability exists:

> In order to establish a disability under the SSA, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  A claimant is considered unable to engage in any substantial activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability.  In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful

---

[29] *Smith v. Califano*, 637 F.2d 968, 970 (3d. Cir. 1981).
[30] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[31] 42 U.S.C. § 423(d)(1)(A).

activity.  If the claimant is found to be engaged in substantial activity, the disability claim will be denied.  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functioning capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.[32]

If the ALJ determines that a claimant is either disabled or not disabled at any step in the sequence, the analysis stops.[33]

### ALJ's Determination That Plaintiff's Depression Was Not Severe

The court agrees with the ALJ's determination that plaintiff's depression was not a severe impairment because it did not impose significant restrictions on her ability to perform basic work activities.  Plaintiff argues that she was having frequent crying spells, decreased energy, anxiety, and a desire not to be around people.  In addition, plaintiff contends that the ALJ did not properly evaluate her symptoms and did not consider her testimony or her complaints to her psychiatrist, other than to say that the depression was not severe.

The ALJ is responsible for determining whether a claimant's impairments are severe.[34]  In addition, it is plaintiff's burden to prove that her impairment was severe at

---

[32] 186 F.3d 422, 427-28 (3d Cir. 1999).
[33] *See* 20 C.F.R. § 404.1520 (a) (2002).
[34] 20 C.F.R. §§ 404.1521(a), 416.921(a).

the ALJ hearing.[35]  In *Lane v. Commissioner of Social Security*, the Third Circuit upheld

an ALJ's decision finding that the plaintiff was not disabled because her impairments

were not severe.[36]  The plaintiff contended that the ALJ ignored her medical evidence

on the record by finding that she could work.[37]  However, the court disagreed and stated

that because it is the duty of the plaintiff to prove that an impairment is severe, the

Commissioner is entitled to rely on both what is said in the record and what is not said

in the record.[38]

Similar to *Lane,* the case at hand lacks evidence in the record to prove that

plaintiff's depression is severe.  While plaintiff contends that her depression is severe,

has documented complaints to her psychiatrist, and takes medication for her

depression, there is substantial evidence which suggests that her depression is not

severe.  During three separate trips to Delaware Cardiovascular Associates from

August 30, 2004 to February 2, 2006, plaintiff denied any depression, anxiety, or

alcohol abuse.

During two separate visits to plaintiff's psychiatrist, Dr. Ahmed, she reported fair

control over her symptoms.  In addition, Dr. Ahmed never imposed any work related

limitations or any other limitations, and indicated that her condition had improved.

Therefore, substantial evidence exists on the record to support the ALJ's finding that

---

[35] 20 C.F.R. §§ 404.1512, .1520(a)(4)(ii), 416.912, .920(a)(4)(ii); *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

[36] *Lane v. Comm'r of Soc. Sec*., 100 Fed. Appx. 90, 96 (3d Cir. 2004).

[37] *Id*. at 91.

[38] *Id*. at 95. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (3d Cir. 1983) (holding that Commissioner is entitled to rely not only on what the record says, but also on what it does not say).

plaintiff's depression was not severe.

**Plaintiff's Subsequent Award of Benefits**

Plaintiff's subsequent award and determination of disability by the Social Security

Administration does not establish that the ALJ's decision was incorrect.  Plaintiff argues

that the subsequent decision by the Social Security Administration, which found plaintiff

to be disabled starting one day after the ALJ's decision, calls that decision into

question.  Plaintiff proposes that the only reason why the SSA did not find for an earlier

date was because of the ALJ's decision and that the case should be remanded to

determine how far back the onset of plaintiff's disability occurred.

In *Bradley v. Barnhart*, the plaintiff, William J. Bradley, filed an application for

disability insurance benefits.[39]  Bradley claimed vertigo, arthritis, and nerve damage in

his feet, and asbestosis.[40]  An ALJ issued a decision on April 29, 2005, finding that

Bradley was not entitled to benefits.[41]  On September 26, 2005, Bradley instituted an

action seeking judicial review of the administrative decision and on September 28,

2005, the SSE determined that he was disabled, with an onset date of April 27, 2005,

the day after the ALJ denied his first application for benefits.[42]

The *Bradley* court classified the subsequent ruling finding Bradley disabled as

new and material evidence.[43]  "New evidence is that which is neither duplicative nor

cumulative.  Material evidence is that which has the reasonable possibility of changing

---

[39] 463 F.Supp. 2d 577, 578 (S.D.W.Va., 2006).
[40] *Id* at 578.
[41] *Id*.
[42] *Id*. at 578.
[43] *Id*. at 579.

the outcome."[44]  The court held that the subsequent decision satisfied both requirements.[45]

In addition to the new and material requirements, the evidence must also relate to the period on or before the date of the ALJ's denial of benefits.[46]  The court held that the evidence need not have existed on or before the date of the decision, but that it need only relate to that period.[47]  The court found that the evidence to determine the subsequent disability award obviously existed and related to the time period in question and therefore, called for a remand of the case to the ALJ to determine when the real onset date of disability occurred.[48]

On February 28, 2008, the United States District Court for the District of Delaware dealt with the same issue in *Kendall v. Astrue* and came to a different conclusion than *Bradley*.[49]  In *Kendall*, the plaintiff was denied social security benefits by an ALJ and that decision became the final decision of the Commissioner.[50]  The plaintiff complained of depression, anxiety, high blood pressure, headaches, and stress.[51]  The plaintiff appealed the ALJ's decision asserting that the case be remanded because of a Notice of Award from the SSA, finding her disabled under SSA issued the day after the ALJ's decision denying her benefits became final.[52]

---

[44] *Id.* at 581
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] 2008 U.S. Dist. LEXIS 15124 (D. Del. Feb. 28, 2008).
[50] *Id.* at *1.
[51] *Id.* at *3.
[52] *Id.* at *52.

The *Kendall* court discussed the view adopted by the Southern District of West Virginia in *Bradley*.[53]  *Kendall* noted that the Third Circuit treats such evidence differently.[54]  "In order for evidence that was not submitted to the ALJ to be considered by a District Court as a basis for remand, the evidence 'must not only be new and material but also be supported by demonstration by claimant of good cause for not having incorporated the new evidence into the administrative record.'"[55]  In addition, new evidence must actually be new and not merely cumulative of what is already in the record. [56]

In order for evidence to be deemed material, it must be relevant, probative, and present a reasonable possibility that it would have altered the outcome of the Commissioner's determination.[57]  "Thus, an implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition."[58]  *Kendall* held that a Notice of Award is just the "sort of evidence of a later-acquired disability or subsequent deterioration of a previously non-disabling condition that the Third Circuit has held does not meet the materiality requirement."[59]  In addition, the plaintiff did not provide evidence that the second and more favorable decision relied only on medical reports prepared prior to the

---

[53] *Id.*
[54] *Id.* at *53.
[55] *Id.* at *52.
[56] *Id.*
[57] *Id.* at *53.
[58] *Id.* at *53 (*citing Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984)(internal citation and quotation marks omitted)).
[59] *Id.* at *53.

first decision.[60]

The *Kendall* case is directly on point.  In the current matter, there is no indication that the second more favorable ruling relied only on evidence prepared prior to the initial ruling.  It is very possible that the second more favorable ruling relied on different medical records and new reports.  In addition, the notice of award is evidence of a "later-acquired disability or subsequent deterioration of a previously non-disabling condition" that the Third Circuit has held does not meet the materiality requirement for remand.[61]  Therefore, plaintiff's argument that the ALJ erred in his decision in light of a subsequent award of disability benefits is refuted by substantial evidence.

**Plaintiff's Testimony Is Not Fully Credible**

Substantial evidence supports the ALJ's conclusion that plaintiff's testimony as to her pain and symptoms is not entirely credible.  The RFC tests, performed by two different physicians, and the conclusions draw from those tests conflict with plaintiff's testimony.  Notably, the second physician determined that plaintiff was exaggerating her symptoms and pain.  In addition, the first doctor to treat plaintiff for her syncopal episode in January 2004 indicated that she could return to work.  The only limitation imposed by a treating physician was a driving restriction, which was temporary and is no longer in effect.  The ALJ did not conclude that the plaintiff had no impairments, but found that those impairments did not meet the requirements for disability under the SSA.

---

[60] *Id.* at *53-4.
[61] *Id.* at *53.

24

In *Hartranft v. Apfel*, the plaintiff was denied social security disability insurance benefits.[62]  The court and ALJ concluded that the plaintiff had been injured, but was not disabled within the meaning of the SSA.[63]  The plaintiff argued that the ALJ failed to consider all of his subjective symptoms in determining that he could perform the full range of light duty work.[64]  However, the court found that because the plaintiff's statements concerning his pain and its impact on his ability to work were not entirely credible, the ALJ need not consider them in his analysis.[65]

In upholding the ALJ's decision, the court noted that the three inconsistencies cited by the ALJ were: "1) the objective medical evidence on the record; 2) plaintiff's testimony as to his rehabilitation and medication regimen; and 3) plaintiff's own description of his daily activities."[66]  The court affirmed the ALJ's findings because there were multiple inconsistencies regarding the plaintiff's complaints of pain and symptoms.[67]

In the present matter, plaintiff's treating physician, Dr. Ionita, lifted the driving restriction, and noted that her black outs were occurring with less frequency.  In addition, plaintiff testified that she can control her dizzy spells and return to feeling normal within a short period of time.  As to her back and knee pain, plaintiff was advised to exercise and there is no evidence that those symptoms prevented her from returning to work.

---

[62] 181 F.3d 358, 361-62 (3d Cir. 1999).
[63] *Id*. at 359.
[64] *Id*.
[65] *Id*. at 362.
[66] *Id*. at 360.
[67] *Id*.

The two residual functional capacity assessments performed in June and September 2004 indicate that plaintiff can lift up to twenty pounds occasionally and ten pounds frequently, that she can stand, walk, or sit for six hours in an eight-hour day, and that she has an unlimited ability to push and pull.  The only limitation imposed by her treating physicians on her functional capabilities related to driving, which was subsequently removed.

Moreover, plaintiff's testimony conflicts with her physician's records, her own conduct, and the VE's testimony.  Plaintiff stated that she no longer socializes with family or friends, but both she and her sister in-law testified that they visit each other regularly (three or four times a week).  Plaintiff complains of serious leg pain, but admits that she can stand for four hours before it becomes too painful and that she occasionally walks to the grocery store.  Plaintiff claims that she is depressed: however, on numerous occasions she told doctors that she was not depressed. Ultimately, it is the ALJ's sole responsibility to determine the extent to which a claimant's testimony is an accurate portrayal of her symptoms.[68]  The ALJ referenced specific instances where plaintiff's complaints of pain and other subjective symptoms were inconsistent with the medical records, the VE's testimony, and her own account of her daily activities.  Therefore, the ALJ's finding that plaintiff's testimony was not entirely credible is justified.

### ALJ Properly Relied on the Vocational Expert's Testimony

There is substantial evidence that the ALJ properly relied on the VE's testimony

---

[68] *Id*. at 362.

26

that plaintiff could return to her past relevant work.  The ALJ's hypothetical question to that expert is reliable when it accurately reflects all of the claimant's credible and relevant medical limitations.[69]  The ALJ's RFC assessment and hypothetical question, however, do not have to include work-related or medical limitations that are not supported by the record.[70]

Plaintiff contends that the hypothetical question did not accurately reflect all of her impairments because it failed to include her depression and blood thinner medication.  The ALJ's RFC assessment and hypothetical question did not include all of her complaints because the ALJ found that plaintiff's testimony was not fully credible.  Plaintiff's argument, as observed by the Third Circuit, is merely a restatement and re-characterization of her dispute with the ALJ's adverse credibility determination, which this court has found, is supported by substantial evidence.[71]

Since the ALJ determined that plaintiff's depression did not effect her ability to work because it was not severe, it need not be part of the hypothetical question to the vocation expert.  Similarly, the ALJ was not required to include in the hypothetical question plaintiff's statements regarding the length and severity her symptoms, because the ALJ determined that her testimony in that regard was not credible.

Plaintiff also argues that the VE's testimony was incomplete and inaccurate because the ALJ's RFC assessment and hypothetical question did not include possible uncontrolled bleeding due to the Coumadin.  There is no evidence that taking

---

[69] *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).
[70] *Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004).
[71] *Rutherford*, 399 F.3d 546, 554 n.8.

27

Coumadin resulted in any work restrictions.  No limitations were imposed by her treating physicians because of that medication.

In *Rutherford v. Barnhart*, the plaintiff challenged the ALJ's denial of  SSI.[72]  The plaintiff claimed that she was disabled because she suffered from severe obesity, leg pain, back pain, weakness in her right arm, and extreme drowsiness due to her prescription medications.[73]  On appeal, the plaintiff argued that the ALJ could not rely on the vocational expert's responses to the hypothetical question because it did not contain all of her physical limitations.[74]

The *Rutherford* court emphasized that the "all impairments" language is often misunderstood and does not require "an ALJ to submit to the vocational expert every impairment alleged by a claimant."[75]  Rather, the "ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations."[76]  In the instant matter, although plaintiff was prescribed Coumadin, there is no medical evidence that she experienced any physical limitations or problems because of that medication.  No restrictions on her daily activities were imposed by her physicians due to the Coumadin.  In addition, the VE testified that the risk of a cut or a bruise from her former employment and her present daily activities were essentially the same.  The record fails to demonstrate that plaintiff's use of Coumadin caused a work-related concern.  Therefore, the ALJ's restriction on plaintiff's examination of the VE regarding her blood

---

[72] *Id.* at 549.
[73] *Id.* at 550.
[74] *Id.* at 553.
[75] *Id.* at 554.
[76] *Id.* at 554.

thinner medication was not improper.

**ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, I recommend that:

(1) Defendant's cross-motion for summary judgment (D.I. 17)  be GRANTED.

(2) Plaintiff's motion for summary judgment (D.I.15), or in the alternative, to have the case remanded for another hearing (D.I. 16) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D.Del.LR 72.1.  The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is available on the Court's website, www.ded.uscourts.gov.


June 22, 2009                              /s/ Mary Pat Thynge_____
                                           UNITED STATES MAGISTRATE JUDGE